**Opinion issued October 7, 2025**



In The

# Court of Appeals

For The

# First District of Texas

_____

**NO. 01-25-00273-CV**
_____

**IN THE INTEREST OF Z.B., A CHILD**

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2024-00792J**

---

## MEMORANDUM OPINION

A trial court terminated Z.B.'s mother's parental rights after finding that she failed to comply with the provisions of a court order and that termination was in Z.B.'s best interest. The trial court appointed the Texas Department of Family and Protective Services ("the Department") permanent managing conservator of Z.B. At trial, the Department, the child's attorney ad litem, and the mother all argued

against termination of the mother's rights. Only the court appointed child advocate opined that termination of the mother's parental rights was in Z.B.'s best interest.

On appeal, the mother argues that the evidence was legally and factually insufficient to support the trial court's findings that she failed to comply with the provisions of a court order and that termination of her rights was in her daughter's best interest. She also challenges the trial court's appointment of the Department as permanent managing conservator of Z.B.

We agree with the mother in part. Although our analysis compels the conclusion that evidence of the mother's failure to strictly comply with specific and material requirements of her family service plan is legally and factually sufficient to support the trial court's predicate act finding, we cannot reach the same conclusion as to the court's best interest finding. Because we conclude that the evidence was factually insufficient to support the trial court's best interest finding, we reverse that portion of the decree that terminated the mother's rights to Z.B., and we remand this case to the trial court for a new trial. We affirm the appointment of the Department as permanent managing conservator.

## Background

### I.    Removal

About a month before her third birthday, Z.B. was living with her mother and her mother's boyfriend, Ernest Royal. Royal had been physically violent, so

2

the mother took Z.B. to a hotel room. But three days later, the mother and Z.B. returned to the home they shared with Royal. The next day, the Department intervened to investigate a report of abuse or neglect of Z.B. The Department enlisted the assistance of several law enforcement officers, which was necessitated by Royal's aggressive behavior. Z.B. had bruises and burns on her forehead and ears, her abdomen, right leg, neck, side, and back. The mother acknowledged that Z.B. had been in Royal's care, denied knowing that Z.B. had been burned, and supported Royal's explanation that the child's injuries were caused by an accidental fall at his friend's tire shop. The mother acknowledged that Z.B. had not received medical care for her injuries and burns.[1]

The Department brought Z.B. to Texas Children's Hospital, where an examination confirmed that she had suffered intentional injuries.[2] The Department contacted Z.B.'s maternal grandmother and maternal aunt. Both women indicated that they had last seen Z.B. two months earlier, Z.B. had no bruising or burn marks when they last saw her, and they were concerned about Royal's criminal activities.

---

[1]   It was later determined that the child had been intentionally burned with a curling iron. At the time of removal, Z.B. was asked who caused the injuries, and she pointed at Royal and said, "Daddy."

[2]   The removal affidavit indicates that the reporter was concerned that Royal was physically abusing her in retaliation for the child's unwillingness "to perform sexual acts." The child underwent an examination by a Sexual Assault Nurse Examiner at Texas Children's Hospital. The Department ruled out sexual abuse in July 2024.

Both women expressed concern about Z.B.'s mother's poor decision-making regarding men. The maternal grandmother's health prevented her from taking possession of Z.B., but the aunt said she was willing to care for Z.B. if necessary. Z.B.'s mother would not consent to Z.B.'s placement with relatives.

Finding that there was an immediate danger to the physical health or safety of Z.B., the trial court signed an emergency temporary order appointing the Department temporary sole managing conservator of Z.B., who was placed with foster caregivers. The court appointed an attorney to represent the mother. On April 8, 2024, the court ordered the mother to submit to hair follicle and urine drug testing. The results were negative.

## II. The Service Plan

After an adversarial hearing, the trial court entered an order requiring the mother "to comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit."[3] The order notified the mother that failure to comply with the court's orders—including the Department's service plan—"may result in the restriction or termination of parental rights."

The mother's May 2024 service plan indicated that she hoped for Z.B. to be returned to her or placed with a family member. The mother's service plan

---

[3] The trial court terminated the parental rights of Z.B.'s father, who is incarcerated and has an expected release date in 2032. He is not a party to this appeal.

included the following requirements, which were intended to help the mother meet the goal of demonstrating that she can keep her daughter safe and protect her from danger or harm:

- Complete a domestic violence assessment, being honest and truthful to receive recommendations based on her needs. Follow all recommendations from the assessment.

- Sign a release of information or HIPAA release form to allow the Department access to necessary information.

- Provide support as required by the court, and in the absence of an order requiring the payment of child support, provide Z.B. with needed items like clothing and shoes.

- Refrain from criminal activity.

- Attend all court hearings, meetings, conferences, and family visits, or notify the caseworker 24 hours in advance if she is not able to attend.

- Complete a caregiver resource form and provide it to her caseworker directly or through her attorney "if she wishes for [her] child to be placed with any appropriate family members."

- Maintain stable employment and provide her caseworker with paystubs as proof of employment.

- Maintain safe, stable, and drug-free housing for a minimum of 6 consecutive months. "She must be able to provide food, clothing, and shelter for herself and her child. She will provide worker with a copy of lease with her name on it as a proof. [She] will not have anyone living in the home that has Reason to Believe CPS history, drug and alcohol history, or criminal history that involves activities endangering a child. [Mother] will provide accurate information including full legal name, date of birth, social security numbers, and driver's license number on anyone residing in her home. She will report any changes in the home composition to the caseworker within a week of said change."

5

- Complete a psychological evaluation, being honest and truthful during assessment. Follow all recommendations from the assessment including individual therapy, drug assessment, domestic violence assessment, etc.

- Complete parenting education classes and submit a certificate of completion to her caseworker.

The plan did not, however, include a random drug testing requirement. Instead, the plan noted that the mother's April 5, 2024 hair follicle and urine drug tests were negative, and "[n]o further assessment/treatment is needed at this time."

## III.     The Mother's Compliance with the Plan

The mother obtained and maintained employment through the pendency of the case. At the time of Z.B.'s removal, the mother's only source of income was $700 per month in food stamps or SNAP benefits, but by November 2024, she was earning $2,884.40 per month.

A permanency report stated that the mother was "in compliance" with the service plan's participation requirements. She participated in visitations; however, she was late to some of them. The child advocate recalled one visit in November 2024 that was scheduled for 9:00 a.m., but the mother did not arrive until 9:50 a.m. The mother expressed displeasure upon seeing Z.B.'s excitement to see her foster mother, whom she called "mom," and who arrived promptly at 10:00 a.m. The mother completed the caregiver resource form and provided food, toys, and clothing for Z.B. during her visits. The Child Advocates February 20, 2020 report

6

indicated, however, that the mother "has been on time for her recent visit and displays care for [Z.B.]."

The Department noted that the mother had not provided a certificate of completion of parenting classes, however, the child advocate indicated in her report that the mother provided a certificate of successful completion of her parenting course as of June 5, 2024.

According to a February 2025 permanency report, the Department stated that the mother had no criminal history, and the Department continued to monitor whether the mother would be charged with a crime in connection with the abuse of Z.B.

The mother signed the required information release, and she had a psychosocial evaluation on April 5, 2024 with "Integrated Health Services Division Clinical Services." The evaluator recommended that she have 10 to 12 sessions of individual counseling with a clinician experienced in complex trauma, participate in a parent education class, maintain stable income for a period of six months, maintain safe, stable, and appropriate housing for herself and her child for a period of six months, and participate in regular supervised visitation. The mother completed a psychosocial assessment at a wellness counseling center on January 12, 2025, and she was diagnosed with "adjustment disorder unspecified and other stressful life events affecting family and household." She attended

7

orientation on January 29, 2025, and, by February 14, 2025, she had participated in three of the twelve recommended weekly therapy sessions. The mother completed a domestic violence assessment on May 30, 2024, and she completed eight weeks of trauma group therapy, from which she was successfully discharged.

In the February 2025 permanency report to the court, the Department noted that the mother had been living with her stepmother since March 2024, but her name had not been added to the stepmother's lease. Although the mother provided the Department with a notarized letter in which she stated she lived in the home, the Department informed her that this was insufficient. In December 2024, the mother presented Child Advocates' Advocacy Coordinator with a residential lease agreement showing the mother as the tenant and her stepmother as the landlord. In addition, a caseworker assessed the home, but the worker became concerned when the mother refused to identify "a strange person in the home." In February 2025, the mother talked about moving to her own apartment.

The mother's service plan did not require the mother to submit to random drug testing, but the Department's December 30, 2024 permanency report to the court included "random drug testing" in the section about parental progress on the service plan. The report, which was not signed by the mother, stated:

> Random Drug Testing: [Mother] will participate in random drug testing. She will be called on the day of the test. She will have until the facility closes to submit to the drug test (facility closing times may vary). All no shows will be considered positive.

A later report, dated February 14, 2025, listed the requirement only as "random drug testing." The mother submitted to numerous drug tests, all of which were negative,[4] and she failed to appear several times.[5] The trial court ordered the mother to submit to hair follicle and urine drug tests on January 7, 2025. The mother submitted to a urinalysis, which was negative for drugs, but she was unable to submit to the hair follicle analysis because her hair was too short. The mother submitted to drug testing on February 11, 2025, and the February permanency report indicated that results were pending. On February 13, 2025, the mother was ordered to complete a urinalysis and hair drug test.

## IV.    Z.B.'s Experience

According to the Child Advocates' March 2025 report, Z.B. had thrived in her foster placement. Her injuries and burns healed with proper care. She had become potty trained, advanced to a pre-K classroom at daycare, and showed great progress in speech therapy that began in October 2024 at the request of the foster

---

[4]    The mother tested negative for drugs on the following occasions: 4/5/2024 hair follicle and urine; 7/15/2024 hair follicle and urine; 7/29/2024 urine; 8/14/2024 urine; 9/26/2024 urine; 10/15/2024 hair follicle and urine; 10/30/2024 urine; 12/10/2024 urine; 1/7/2025 urine; 1/29/2025 urine.

[5]    The Department's February 2025 permanency report showed the following instances when the mother did not submit to random drug testing: November 2024, when the mother said she was unable to submit to drug testing due to training at her job; 12/23/2024 failed to submit to a urinalysis; 1/7/2025 failed to submit to a court ordered hair follicle test because the mother did not have enough hair; 1/15/2025 failed to submit for a urinalysis; 1/29/2025 failed to submit to urinalysis but appeared on 1/31/2025 and urinalysis was negative, although the mother refused to submit to hair follicle analysis.

parents. In addition to meeting Z.B.'s educational, medical, and personal needs, the foster parents gave Z.B. undivided attention and took her on family outings. The child advocate noted in her report that Z.B. is "very bonded with her foster family," and that the daycare director described her as "a very kind, respectful, and curious child, who love[s] to learn new things and participate in activities with other children." The child advocate also reported that the director observed that Z.B. "seems to be loved, greatly taken care of, and happy." The Department's February 2025 permanency report stated that Z.B. had visited with her paternal grandmother and sibling.

## V.    Developments Before Trial

Throughout the case, the Department researched relatives and friends named by the mother and father, who was incarcerated at the time of removal and remains incarcerated. The mother's sister was rejected due to concerns about her ability to care for Z.B., and the father's mother was rejected based on her home study. The mother's stepmother, with whom mother lived during the case, did not provide the information necessary to proceed, and another friend identified by the mother did not maintain contact with the Department regarding a potential placement of Z.B. On February 13, 2025, the mother identified Ms. Moore as a potential placement. Moore is the mother of the mother's half-sister.

In early March 2025, the Department filed a motion to retain the suit on the court's docket and set a new dismissal date beyond the March 24, 2025 dismissal date, as permitted by the Texas Family Code.[6]

## VI.    Trial

### A.    Hearing on Motion to Extend the Dismissal Date

At trial, before evidence was presented, the Department asked the court to extend the dismissal date to allow more time to investigate Ms. Moore as a placement for Z.B. The Department acknowledged that Child Advocates was not in agreement and wanted to go forward with termination, but it represented to the court that it was not requesting termination at that time. The child advocate, who had visited Ms. Moore's home only once, argued in favor of termination because she had visited Ms. Moore's home only once and because she believed that the mother was going to be charged with a crime in connection with Z.B.'s abuse. The mother's counsel interjected to clarify that no charges had been presented or accepted. The mother's counsel argued that the mother agrees with extension of the case and placement of Z.B. with Ms. Moore. She said that Ms. Moore is already a licensed foster parent, neither the Department nor the attorney ad litem for the child had concerns with Ms. Moore as a placement, and Z.B. had visited with Ms. Moore in her home. The child advocate responded that Ms. Moore had a "drug

---

[6]     *See* TEX. FAM. CODE § 263.401.

charge" from 2017 and that Ms. Moore was in possession of a couple of "lavish items," which the child advocate believed were inconsistent with her receipt of disability benefits. The attorney ad litem for the child indicated that Ms. Moore received deferred adjudication in 2008 from the drug charge, her daughter, who is in the U.S. Air Force, helps her with finances, and Ms. Moore works part-time doing odd jobs. The attorney ad litem explained that Ms. Moore was raising her two grandchildren who were placed with her when the Department was given permanent managing conservatorship, and Moore said she would have come forward sooner, but she only recently learned that Z.B. was in foster care from her daughter, who is the mother's half-sister.

The court denied the motion to extend the disposition date, and the termination trial proceeded.

## B. The Testimony

### 1. The Caseworker

The caseworker testified at trial that the Department believed the mother was still in contact with Royal. She based this on a conversation she had with the mother in September 2024, when the mother initially answered, no, when asked if she had any contact with Royal. The caseworker informed the mother that they had requested telephone records from prison, and the mother's "body language, her demeanor, was [as] if she was nervous." The mother conceded that she had been in

contact with Royal, but she said Royal had initiated the contact by calling her. The Department never received the telephone records, and the caseworker acknowledged that she had no proof whether the mother called Royal or he called her. The caseworker had no knowledge of the mother visiting Royal in person.

The caseworker testified that she believed permanent managing conservatorship to the Department would serve Z.B.'s best interest rather than termination of the mother's rights because it would allow the mother to continue to have supervised visits, complete her therapy, and demonstrate proof of stable housing.

The caseworker testified that the mother was substantially compliant with the service plan with the exception of providing a stable home, completing "a couple more sessions of therapy," and one missed visitation in February. The caseworker stated that the mother "has been late to quite a few visits; two of which we had to cancel due to her being so late." But the caseworker also said that the mother attended the majority of the visitations. She testified that the Department was not seeking termination of the mother's rights, but it was seeking placement of Z.B. with Ms. Moore to allow the Department to monitor the placement for permanency for Z.B. She clarified that the Department was seeking an order of permanent managing conservatorship to the Department and possessory conservatorship with supervised visitation to the mother.

The caseworker testified that the Department remained concerned that the mother would not protect Z.B. because the mother did not believe that people who lived in or frequently visited her home needed a background check. She said that the Department had asked the mother's therapist to work with the mother to understand the importance of her "protective capacity."

The caseworker testified that Z.B. was in a foster placement with potential adoptive parents, but the Department wanted to move Z.B. to Ms. Moore, whose home study for the placement of her two young grandchildren had been completed in December 2024. She noted that Ms. Moore has no relationship with the mother or Z.B., aside from a single two-hour in-home visit. The Department's plan was to transition Z.B. with additional visits with Ms. Moore, including a weekend visit, before moving her. She said that this was in Z.B.'s best interest because Z.B. was already bonded to her foster parents, and "the longer she stays in that home and that [is not a] permanent placement, it could be detrimental to her in the future." She testified that they had located an appropriate fictive kin placement and wanted to move forward to see if that would be a permanent option for Z.B.

The caseworker testified that the mother was living with a relative, saying: "I believe, it's like her aunt."[7] The mother had informed the caseworker that she

---

[7]     The Department's February 14, 2025 permanency report, which stated that the mother had been living with her stepmother since March 2024. The Child Advocates report filed February 20, 2020, stated that on February 8, 2025, during

was paying rent along with another bill, but the caseworker noted that mother had not been able to provide "an actual document to reflect that she does live there, that she has a right to live there." The caseworker said that the mother had informed her that she had been denied for an apartment due to past debt, which she was working to resolve. Asked by the mother's attorney whether the mother was in compliance or not in compliance, the caseworker testified: "I would say that mom is in compliance."

The caseworker said that the mother took accountability for missing the last visitation and apologized, but she did not provide a reason as she had done previously when she arrived late due to traffic or similar reasons. The caseworker testified that the mother and Z.B. "do have a bond" and that the mother is appropriate during the visits. The caseworker also clarified that it was the mother's "aunt" and her boyfriend who refused to consent to a background check, and the caseworker agreed that their refusal was "not [the mother's] fault."

The caseworker testified that she was not with Z.B. during her visit with Ms. Moore, but she "was told that the visit went very well," and there were no concerns. After the visit, Z.B. had a potty accident that night, and the foster parents reported that as they spoke with her about the possibility of moving, Z.B. became

a supervised visit with Z.B., the mother said that she planned to move from her stepmother's home in Humble, Texas to her mother's home in Houston, Texas. Trial was held on March 5, 2025.

clingier, seeking additional "cuddle[s]" at night. She agreed this was "nothing extremely out of the ordinary" in light of Z.B.'s age.

## 2. The Mother

The mother testified that she reached out to her half-sister by phone to get in contact with Moore. She said she did not know why Ms. Moore was not present at the trial, saying: "I was told previous that they [were] supposed to send her the link. I really don't know what happened." The mother testified that she was not in contact with Royal, and she said that she last spoke with him "probably when the investigation opened, the time when my daughter got removed."

The mother testified that she had a nine-year-old son who lived with his father. She said that she communicates with her son, who has a phone, after school and on the days she does not work. She said she also communicates occasionally with Z.B.'s father, who sometimes checks on Z.B.

The mother agreed that the Department should be named permanent managing conservator. She said that she wanted Z.B. to be placed with Ms. Moore "[b]ecause she'll be with family members who love her and who care for her." She believed that Moore would take good care of Z.B. She also testified that placement with Moore would serve Z.B.'s best interest because it could create additional opportunities for connection between her and her daughter. She said:

> I just feel that it is in my child's best interest because it's more opportunity that I can have with my child. I miss her. Like, I have to

16

see her when I'm able to see her with CPS. And if she was with Ms. Moore, me and Ms. Moore can make arrangements. I can spend more time with her. I could be more involved with her. If she gets into supports [sports] or things like that.

The mother acknowledged that if the court granted permanent managing conservatorship to the Department, her visits with Z.B. would remain supervised. She agreed to abide by all rules and conditions regarding visitation that the Department may set, and she testified that if the Department offered her additional services, she would continue to work them.

In response to a question from the court about why she waited almost a year to reach out to Moore, the mother said that she was not in contact with her sister or Moore, so she provided the Department with other names. When the people she identified were not approved, the Department asked for more names, and she reached out to her half-sister. She conceded that she could have reached out to her half-sister sooner, but she said that she thought the other people she named would suffice. She could not explain why she did not suggest her son's father as a potential placement.

### 3.  Child Advocates

Finally, the Advocacy Coordinator (AC) for Child Advocates testified. She testified that "Child Advocates' recommendation is for parental rights to be terminated and [Z.B.] to remain in her current foster home. She testified that she saw the injuries that brought Z.B. into care, she understood that Royal was the

17

perpetrator, and she said that the mother said little about except to acknowledge that dating Royal was "a wrong decision."

The AC testified that in December 2024 she reached out to the father of Z.B.'s nine-year-old half-brother. According to the AC, the father said that the mother "does not reach out to her son, unless it's during the holiday season."

The AC testified that Z.B. was doing well in her current placement, which was "an adoptive placement." She also said that visitation between Z.B. and her mother went "really well."[8] The court asked the AC about the foster home and why she thought remaining there was in Z.B.'s best interest. The AC testified that Z.B.'s current foster placement included another foster child and that the foster parents had no biological children. As to Z.B.'s best interest, the AC testified:

> I believe that [the mother] had several opportunities to bring up potential placements for [Z.B.]. Child Advocates made a lot of efforts to reach out to her and ask for potential placements, family members. And she always said that she can't think of anyone. And [Z.B.] is so attached to her foster home. They do whatever they can to meet all her needs medically, educationally. And we just believe it's in the best interest for [Z.B.] to remain there. . . . I would say the family is amazing. They do a lot of family time: as in, they take kids certain places. They're always bringing them to their therapies. They have a really close connection with their educational providers. Overall, they're doing everything that they can to provide and meet their needs.

---

[8]    Q.    How did visitation go with mom and our child in our case?
       A.    From what we're seeing, she's doing really well.
       Q.    She ever provided for the child?
       A.    I'm not too sure about that. Yes. Ms. Brandy says yes.

18

## C. Closing Arguments

In closing argument, the Department, the mother, and the attorney ad litem all argued in favor of an order for permanent managing conservatorship to the Department with possessory conservatorship to the mother, an order that the mother pay minimum-wage child support, and an order lifting the prior "no movement" order to allow Z.B. to transition to Ms. Moore's care. The attorney ad litem for Z.B. argued that although the foster parents "have gone above and beyond their capacity to take care of this child, and they love her to death," Texas law and policies require that, if possible, a child be placed with family "so that this child when she turns 18 does not feel like we took her away from her family." The attorney ad litem for Z.B. also argued that Ms. Moore had an extra bedroom for Z.B., and she was taking good care of the other two children under five years old that were already in her care.

## D. The Final Decree of Termination

The trial court signed a final decree terminating the mother's parental rights to Z.B. The court found by clear and convincing evidence only one predicate act: the mother failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of Z.B. The court also found that the mother failed to raise a defense that she was unable to comply with the specific provisions of a court order and that she made a good faith

effort to comply and her failure to do so is not attributable to any fault of hers. Finally, the court found by clear and convincing evidence that termination of the mother's rights is in Z.B.'s best interest. The court appointed the Department permanent managing conservator of Z.B. The mother appealed.

## Analysis

In her first two issues on appeal, the mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings that she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of Z.B. and that termination of her parental rights was in Z.B.'s best interest.[9] In a third issue, she challenges the appointment of the Department as permanent managing conservator.

## I.      Standards of Review

A parent's "right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted).

---

[9]    On appeal, the mother did not challenge the trial court's finding that she failed to raise a defense that she was unable to comply with the specific provisions of a court order and that she made a good faith effort to comply and her failure to do so is not attributable to any fault of hers. At trial, some evidence showed that the mother attempted to comply with the requirement to provide a lease demonstrating that she had stable housing by providing a lease between her and the relative with whom she was living. Some evidence showed that the mother was unable to comply with the requirement to provide accurate information including full legal name, date of birth, social security numbers, and driver's license number on anyone residing in her home because the mother's relative and her boyfriend refused to cooperate.

"When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Id.* at 759. "A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one." *Id.* (internal quotations omitted). Thus, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

"[T]he rights of natural parents are not absolute," however, "protection of the child is paramount," and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Recognizing that a parent may forfeit her parental rights based on her actions or omissions, the primary focus of a termination suit is protection of the child's best interests. *Id.*

Accordingly, "[i]n parental-rights termination cases, due process mandates a clear and convincing evidence standard of proof." *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019); *see also* TEX. FAM. CODE § 161.001(b). "Clear and convincing" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). "This

heightened burden of proof affects the standard of review in an evidentiary challenge on appeal." *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022).

"To that end, in reviewing a legal-sufficiency challenge, we must determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Id.* (internal quotations omitted). "[W]e look at all the evidence in the light most favorable to the finding, assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* (internal quotations omitted). We may not, however, "disregard undisputed facts that do not support the finding." *Id.* (internal quotations omitted).

In conducting a factual-sufficiency review in this context, we determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a factfinder reasonably could have formed a firm belief or conviction that the finding was true. *See In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

Under these standards, the factfinder remains "the sole arbiter of the witnesses' credibility and demeanor." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009)). In a bench trial, the trial court, as factfinder, weighs the evidence and resolves evidentiary conflicts. *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

## II. Termination of Parental Rights

### A. Legal and Factual Sufficiency of Predicate Act Finding

#### 1. Applicable Law

Section 161.001(b) of the Family Code authorizes an "involuntary termination of parental rights if a court finds by clear and convincing evidence both that a parent engaged in one or more enumerated predicate grounds for termination and that termination is in the best interest of the child." *In re M.P.*, 639 S.W.3d 700, 701–02 (Tex. 2022); *see* TEX. FAM. CODE § 161.001(b)(1)(A)–(U), (b)(2). Under former Section 161.001(b)(1)(O), a parent's rights to a child may be terminated if the parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child." *Id.* § 161.001(b)(1)(O). The Texas Legislature recently

repealed this provision, but the repeal is not retroactive, and it therefore does not apply to this appeal. *See* Act of May 14, 2025, 89th Leg., R.S., ch. 211.

Subpart (O) permitted "termination if a parent fails to comply with a family service plan, which, in lay terms, is a list of tasks the Department requires—and the trial court orders—the parent to perform to obtain the return of a child following removal." *Interest of R.J.G.*, 681 S.W.3d 370, 373 (Tex. 2023). The Texas Supreme Court recently addressed the application of this provision by Texas courts. *See id.* The Supreme Court held that strict compliance with "every aspect of every plan requirement" is not always necessary to avoid termination of parental rights based on the subpart (O) predicate ground. *Id.* at 382. The Court explained that this was so because the statute permitted but did not require termination based on subpart (O) and that some provisions of a family service plan, such as "particularly those that are bureaucratic or technical—may be too trivial, in the larger context of the plan and the parent's overall performance, to have their breach give rise to termination." *Id.* at 381–82.

The Supreme Court clarified that to justify termination of a parent's rights there must be clear and convincing evidence that the parent breached requirements that were "'specifically established' in the written court-ordered service plan," and these requirements must be material and not trivial. *Id.* at 373, 374–75.

## 2.    Application of the Law to the Arguments and Facts

Here, the trial court's sole basis for terminating the mother's parental rights was its finding that she violated subpart (O). In her brief, the mother first argues that the evidence is insufficient to support the trial court's subpart (O) finding because the evidence was legally and factually insufficient evidence that Z.B. was removed for abuse or neglect. Next, she argues that she completed "a material portion" of her service plan, App. Br. 34, and that the Department found her in compliance and declined to seek termination. Finally, she argues that termination based on subpart (O) is no longer permitted due the Legislature's recent repeal of it.

### a.    Evidence of Removal for Abuse or Neglect

The evidence showed that two-year old Z.B. was removed from her mother based on an investigation that showed the child had been intentionally burned. The evidence admitted at trial includes the removal affidavit that details the child's wounds, which appeared to be at risk of infection at the time of removal. The affidavit states that when Z.B. was asked who hurt her, she pointed to Royal and said, "Daddy." The affidavit also explains that although the mother had obtained assistance to leave with Z.B. just days prior to the child's removal, she chose to return to the home she shared with Royal, whom she knew to be violent. The record also includes two color photographs of Z.B.'s injuries. No evidence in the

25

record disputes that Z.B. had not been abused or neglected or that there was any other reason for her removal. Because the evidence of Z.B.'s abuse or neglect was undisputed, the trial court could have formed a firm belief or conviction that she was removed for abuse or neglect as required by subpart (O). *See J.W.*, 645 S.W.3d at 741; *C.H.*, 89 S.W.3d at 25–26.

### b.    Repeal of Subpart (O)

The mother's argument that subpart (O) is no longer applicable is not well founded. H.B. 116, which repealed subpart (O), took effect on September 1, 2025, when this appeal was pending in this Court. The bill included the following provision: "The change in law made by this Act applies to a suit affecting the parent-child relationship that is pending in a trial court on the effective date of this Act or that is filed on or after the effective date of this Act." H.B. 116, Section 3. Because this case was not pending in the "trial court" on the effective date of the Act, the repeal of subpart (O) does not apply. We make no observation about the applicability of this statute on remand.

### c.    Plan Compliance

The mother argues that the evidence is legally and factually insufficient to support termination based on the Department's position at trial against termination and the fact that she materially complied with the plan's requirements. Although the Department did not seek termination at trial, on appeal, it vigorously defends

the termination of the mother's parental rights. The Department argues that the mother failed to comply with the service plan's requirements to (1) complete individual therapy, (2) maintain safe, stable housing for at least six months, (3) participate in random drug testing, and (4) attend all visitations. We focus on those requirements because it is undisputed that the mother complied with all other requirements of her family service plan.

**Individual therapy.** First, the plan required the mother to honestly and truthfully complete a psychological evaluation and follow all recommendations from the assessment. The mother completed two psychosocial evaluations: one on April 5, 2024, and a second one on January 12, 2025. She attended an orientation on January 29, 2025, and she attended three of the twelve required weekly counseling sessions by February 14, 2025. It is undisputed that the mother had not finished the required counseling sessions by the time of trial. At trial, the caseworker testified that the mother had yet to complete "a couple more sessions of therapy." But strict compliance is not always necessary to avoid termination of parental rights based on subpart (O). *See R.J.G.*, 681 S.W.3d at 373. Here, the individual therapy sessions were material because, in part, they were to help the mother address one of the reasons why Z.B. came into care: her failure to protect her daughter from harm. At trial, the caseworker testified that the mother's therapist was working to help the mother understand the importance of protecting

27

her child. However, the mother had completed almost all of the individual counseling sessions, and she had completed numerous other services designed to help her be able to protect her child, including parenting education classes, a domestic violence assessment, eight weeks of trauma group therapy, and maintaining stable employment.

**Safe, stable housing.** The service plan required the mother to maintain safe, stable, and drug-free housing for a minimum of six consecutive months. She was required to provide the Department with a copy of a lease with her name on it, and to prohibit anyone with a prior drug, alcohol, CPS "Reason to Believe," or criminal history involving activities endangering to a child from living with her. She was also required to provide the accurate full legal name, date of birth, social security numbers, and driver's license number on anyone residing in her home.

The evidence showed that the mother lived with her stepmother from March 2024 until about February 2025. Her stepmother refused to add her to the lease, and although the mother attempted to demonstrate that she had stable housing, she did not provide the Department with a lease from the property owner that showed that the mother had a right to live in that premises. The mother instead provided the Department with a notarized letter that she signed, which the Department told her was not sufficient to comply with the specific plan requirement. The mother later provided the child advocate with a lease showing her stepmother as the

28

landlord. In February 2025, the mother told the child advocate that she intended to move in with her mother, and the caseworker testified at trial that the mother was living with her aunt.

The materiality of the requirement to maintain safe, stable, and drug-free housing for a minimum of six consecutive months seems self-evident in a case like this concerning the welfare of a young child. So too is the requirement to provide a lease that demonstrates the mother's right to stay in the home. Providing the Department with a copy of the lease was closely connected to the service plan's stated goal of helping the mother demonstrate that she can keep Z.B. safe and protect her from danger or harm. Unlike a purely bureaucratic requirement, like providing a certificate of completion of a parenting course that the Department acknowledged was completed, *see R.J.G.*, 681 S.W.3d at 381, a lease gives its holder the legal right to occupy a premises, *see, e.g.*, TEX. PROP. CODE §§ 92.001–.355 (Residential Tenancies), which supports the stated goal of stability.

The caseworker also testified that the mother did not comply with the plan requirements because the Department was unable to do a background check on the other people living in the house with the mother. The plan required the mother to provide specific information about people living in the home with her. This information—full legal name, date of birth, social security number, and driver's license number—would allow the Department to do a background check. This

29

requirement, too, is material because of the reasons why Z.B. came into care and the concerns about the mother's poor judgment about people to whom she exposed her daughter, which the Department developed from its initial investigation.

At trial, however, the caseworker conceded that it was not the mother's fault that the people with whom she shared a home refused to consent to a background check. The caseworker said that the mother's application to lease an apartment had been denied due to past debt, which she was working to resolve. Notably, the caseworker regarded the mother as "in compliance" with the plan requirements.

**Visitation.** Like the individual counseling, the mother was nearly fully compliant with visitations. The evidence showed that she missed one visitation in February 2025, for which she took accountability without an explanation. She was late for two visits that had to be cancelled. The mother did not dispute these facts. This requirement is also material because the supervised visitations are what allowed the mother to build and extend an appropriate bond with Z.B. However, the evidence at trial also showed that the mother and Z.B. were bonded to each other, the mother was appropriate and showed care to Z.B. at visitations, and the mother provided Z.B. with food, clothing, and toys at the visits.

**Random drug testing.** The Department's arguments about the mother having failed to appear for random drug testing lacks merit because no such requirement is in the mother's written service plan. To the contrary, the mother's

30

plan noted that her April 5, 2024 hair follicle and urine drug tests were negative and that no additional drug testing or treatment were needed. Although the mother complied with most requests for drug testing—and each test yielded a negative result—no random drug testing requirement appears in the service plan. Because a requirement to submit for random drug testing or have the failure to submit considered a positive test result is not specifically established, the failure to comply with the Department's requests for drug testing cannot be considered as evidence supporting termination under subpart (O). *See R.J.G.*, 681 S.W.3d at 378.

### d. Conclusion

Considering the evidence in the light most favorable to the court's subpart (O) finding, the trial court could have formed a firm belief or conclusion that that the mother failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of Z.B., who has been in the temporary managing conservatorship of the Department for not less than nine months as a result of her removal from the mother for abuse or neglect. *See J.W.*, 645 S.W.3d at 741.

Because the evidence about compliance with the individual counseling, visitation, and housing requirements is not disputed in this case, when we consider the entire record, we reach the same conclusion. In light of the facts of this case, the individual counseling, visitation, and housing requirements were specific and

material, and no evidence demonstrates that the mother fully complied with these requirements. Considering the entire record, including evidence both supporting and contradicting the finding, a factfinder reasonably could have formed a firm belief or conviction that the court's subpart (O) finding was true. *See C.H.*, 89 S.W.3d at 25–26.

We overrule the mother's first issue.

## B. Best Interest of the Child

The mother also asserts that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in Z.B.'s best interest. She relies in part on the evidence that the Department did not seek termination at trial.

### 1. Applicable Law

The purpose of the State's intervention in the parent-child relationship is to protect the best interests of the children, not to punish parents for their conduct. *See A.V.*, 113 S.W.3d at 361. There is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). But there is also a presumption that the "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE § 263.307(a); *see also Interest of E.A.P.*, No. 01-24-

00934-CV, 2025 WL 1460737, at \*24–25 (Tex. App.—Houston [1st Dist.] May 22, 2025, no pet.) (mem. op.).

Because of the strong presumption that maintaining the parent-child relationship is in the child's best interest and the due process implications of terminating a parent's rights without clear and convincing evidence that termination is in the child's best interest, "the best interest standard does not permit termination merely because a child might be better off living elsewhere." *In re J.G.S.*, 574 S.W.3d 101, 121–22 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (cleaned up). "Termination should not be used to merely reallocate children to better and more prosperous parents." *Id.* "And in parental-termination proceedings, the [Department's] burden is not simply to prove that a parent should not have custody of h[er] children; DFPS must meet the heightened burden to prove, by clear and convincing evidence, that the parent should no longer have any relationship with h[er] children whatsoever." *Interest of T.J.I.L.*, No. 01-23-00693-CV, 2024 WL 1169526, at \*11 (Tex. App.—Houston [1st Dist.] Mar. 19, 2024, no pet.) (mem. op.).

The best-interest inquiry focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). A best-interest determination is guided by several non-exclusive factors: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the

33

present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive, and evidence is not required on every factor to support a finding that termination of parental rights is in the child's best interest. *Id.* We may also consider the statutory factors set forth in Section 263.307 of the Texas Family Code.[10] TEX. FAM. CODE § 263.307; *see A.C.*, 560 S.W.3d at 631 n.29.

---

[10]    Section 263.307 provides for the court and the Department to consider the following factors "in determining whether the child's parents are willing and able to provide the child with a safe environment."

(1)    the child's age and physical and mental vulnerabilities;
(2)    the frequency and nature of out-of-home placements;
(3)    the magnitude, frequency, and circumstances of the harm to the child;
(4)    whether the child has been the victim of repeated harm after the initial report and intervention by the department;
(5)    whether the child is fearful of living in or returning to the child's home;
(6)    the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;
(7)    whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

Factfinders may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence when conducting a best-interest analysis. *See E.A.P.*, 2025 WL 1460737, at *25. A parent's past conduct is probative of her future conduct when evaluating the child's best interest. *See id.* A factfinder may also infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent when assessing the best interest of the child. *Id.* Evidence supporting termination under one of the predicate grounds listed in Section 161.001(b)(1) may also be considered in support of a

---

    (8)    whether there is a history of substance abuse by the child's family or others who have access to the child's home;

    (9)    whether the perpetrator of the harm to the child is identified;

    (10)    the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

    (11)    the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

    (12)    whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

        (A)    minimally adequate health and nutritional care;

        (B)    care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

        (C)    guidance and supervision consistent with the child's safety;

        (D)    a safe physical home environment;

        (E)    protection from repeated exposure to violence even though the violence may not be directed at the child; and

        (F)    an understanding of the child's needs and capabilities; and

    (13)    whether an adequate social support system consisting of an extended family and friends is available to the child.

TEX. FAM. CODE § 263.307.

finding that termination is in the best interest of the child. *See C.H.*, 89 S.W.3d at 28.

### 2. Application of the *Holley* Factors

#### a. Desires of the Child

At the time of trial, Z.B. was three years and ten months old, and no direct evidence was presented of her desires. In general, when a child is too young to express herself, this factor is neutral in our analysis. *In re A.J.D.-J.*, 667 S.W.3d 813, 833 (Tex. App.—Houston [1st Dist.] 2023, no pet.). In some cases, we have held that circumstantial evidence of a child's bond with a foster family in the absence of a bond with a parent may support termination. *Id.* In this case, Z.B. lived with her mother until she was almost three, and she had frequent contact with her mother, who attended all but one visitation and provided Z.B. with food, clothing, toys, and appropriate care at those visitations. The evidence showed that Z.B. remained bonded to both her mother and the foster mother. This factor is neutral in our analysis. *See id.*

#### b. Present and Future Physical and Emotional Needs of the Child; Present and Future Emotional and Physical Danger to the Child

"While some children may have extraordinary physical and emotional needs requiring extra care, all children have physical and emotional needs that must be met on a daily basis." *Interest of C.G.*, No. 14-18-00412-CV, 2018 WL 4702403,

36

at *5 (Tex. App.—Houston [14th Dist.] Oct. 2, 2018, pet. denied) (mem. op.). The record reflects that Z.B.'s only extraordinary need was speech therapy, and that she was thriving and growing normally.

The evidence showed that the mother exercised poor judgment about men in the past, specifically in leaving her daughter alone with Royal despite knowing of his violent disposition. A reasonable factfinder could have inferred from this pre-removal behavior that the mother may fail to protect Z.B. again in the future. *See E. A. P.*, 2025 WL 1460737, at *25 (noting that parent's past conduct is probative of future conduct for evaluation of child's best interest).

This element weighs in favor of termination.

### c. Parental Abilities of the Persons Seeking Custody and the Stability of the Home or Proposed Placement

At trial, both the mother and the Department sought to have Ms. Moore appointed managing conservator of Z.B. On appeal, however, the Department takes a different position, arguing in favor of adoption of Z.B. by the foster family. We will consider the evidence of the parental abilities of the mother, the foster parents, and Ms. Moore along with the stability of their homes.

**The Mother.** As we mentioned in section I.B.2.b., above, the court as factfinder could consider the mother's pre-removal conduct in the best interest evaluation. However, we agree with the Amarillo Court of Appeals, which acknowledged the injustice of considering only pre-removal behavior when the

37

evidence shows that the parent has worked the services recommended by the Department and ordered by the court in order to accomplish the goal of safely reunifying with her child. *See Interest of C.A.M.*, 633 S.W.3d 68, 75–76 (Tex. App.—Amarillo 2021, no pet.).

> We are mindful that evidence supporting one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *See In re C.H.*, 89 S.W.3d at 28. But such evidence does not relieve the Department of its heightened burden of proof to show best interest by "clear and convincing" evidence. *In re B.R.*, 456 S.W.3d 612, 616 (Tex. App.— San Antonio 2015, no pet.). We also acknowledge that a trier of fact may measure a parent's future conduct by past conduct and determine whether termination of parental rights is in a child's best interest. *See id. See also In re E.C.R.*, 402 S.W.3d 239, 249-50 (Tex. 2013).

> However, if a parent's misconduct prior to the Department's initiation of termination proceedings is used against that parent in order to seek termination and that parent has complied with the family service plan ordered and has successfully worked services toward the goal of family reunification, then what was the purpose of the service plan in the first place? Would it not have been in the best interests of the children to admit up front that the ultimate end was termination anyway? Because we understand the goal of reunification and the rights of the parties to be of paramount interest, we believe the fact finder must give deferential weight and consideration to the relative success of the parent when it comes to completion of the reunification service plan.

Since Z.B.'s removal, the mother became gainfully and steadily employed, whereas according to her affidavit of indigency, she was not employed before removal. The mother completed parenting classes, domestic violence screening, trauma group therapy, and all but "a couple" of individual counseling sessions.

Although she was unable to strictly satisfy the service plan requirement for maintaining stable housing with a lease in her name, she lived with her stepmother consistently for nearly a year before moving to either her mother's or an aunt's home. She told the caseworker that she was unable to obtain a lease in her own name due to past unpaid debt, which she was working to remedy. While the factfinder could infer from this evidence that the mother was unable to secure safe, stable housing, it could also infer that the mother has family members willing to help her.

No evidence showed that anyone in the home used drugs or alcohol, had CPS history (aside from the mother's present case), or had a criminal history regarding endangerment or abuse of a child. We recognize that this may be due to the mother's failure to provide information to allow the Department to run a background check, but the Department's suspicion about people living with the mother is not evidence. In addition, undisputed evidence at trial showed that the mother was not at fault for failing to provide the required information because it was the aunt and her boyfriend who refused to consent to a background check. This is not clear-and-convincing evidence that the mother was trying to hide the presence of inappropriate people in her home.

The mother attended all but one visitation, for which she took accountability, and two others that were cancelled due to her tardiness. She remained bonded to

Z.B. by attending visitation and providing her with food, clothing, toys, and care at visitations. She testified that she loved and missed her child. The mother agreed to pay minimum wage child support and to continue working services offered by the Department. During the pendency of this case, the mother cooperated with the Department, including submitting herself for random drug testing that was not specifically required by the service plan, which noted that continued drug assessment was not needed. The mother also agreed to placement of Z.B. with Ms. Moore with the hope of remaining a presence in Z.B.'s life while promising to abide by the Department's and the court's limitations on visitation.

In its brief, the Department asserts that the mother's failure to submit to drug tests in this case is evidence of illicit drug use. It is not. As we explained in section II.A.2.c., above, the mother's service plan had no random drug testing requirement and did not inform the mother that any failure to comply would be considered a positive test result. We therefore do not consider a failure to appear as evidence; it is not. The Department also asserts that mother was involved in criminal activity with Royal and speculates that the mother may, at some point in the future, be prosecuted for those activities or in connection with Z.B.'s abuse. The record includes notes in a permanency progress report stating that on March 20, 2024, the day that Z.B. was removed, Z.B.'s maternal grandmother told the caseworker that Royal "had [the mother] doing things that could have gotten her in a lot of trouble

40

with vehicles/rentals," and Z.B.'s maternal aunt told the caseworker that Royal "had [the mother] renting cars for him, and it was a mess of issues that could have gotten her in a lot of trouble . . . ." There is no evidence, however, that the mother was involved in criminal activity. Speculation is not evidence, and it does not satisfy the constitutional mandate that termination of parental rights be supported by clear and convincing evidence. *See N.G.*, 577 S.W.3d at 235.

**The Foster Parents.** The evidence showed that the foster parents had shown exemplary care and love to Z.B., providing for her physical, medical, and emotional needs, and helping her to thrive under their care. The record includes clear-and-convincing evidence of the foster parents' abilities to meet Z.B.'s needs and the stability of their home.

**Ms. Moore.** The evidence showed that Ms. Moore, the mother of Z.B.'s biological aunt (the mother's half-sister), was a licensed foster parent raising two young grandchildren, close in age to Z.B. Z.B. had a two-hour in-home visit with Ms. Moore that went well, and the Department believed that Ms. Moore was able to provide for her needs. In closing argument, the ad litem for Z.B. told the court that Ms. Moore was "excited" about Z.B. and had an extra bedroom for her. We conclude that the record includes clear-and-convincing evidence of Ms. Moore's parental abilities and the stability of her home.

The clear-and-convincing evidence relevant to these factors shows that while the foster parents and Ms. Moore would be able to meet all of Z.B.'s needs in a stable home, the mother was also able to meet some, if not all, of Z.B.'s physical and emotional needs. This factor does not weigh in favor of irrevocably terminating the mother's rights.

### d. Programs Available to Assist Those Persons Seeking Custody in Promoting the Best Interest of the Child

We explained in section I.B.2.c., above, that the mother expressed her willingness to abide by the court's orders and to complete additional services offered by the Department to promote the best interest of Z.B., including counseling, paying child support, and attending supervised visitation. On appeal, the Department argues that there are financial incentives for adoption of a child from the foster care system, such as tuition waivers at state universities, that would be available to the foster parents if they adopt Z.B. We find the Department's argument on this point meritless. First, the Texas Education Code provides benefits for the student, not the parents. *See* TEX. EDUC. CODE § 54.366. Second, the statutory educational benefits would apply in the absence of termination of the mother's rights, for example if Z.B. were placed with Ms. Moore with permanent managing conservatorship awarded either to the Department or to Ms. Moore.

This factor does not weigh in favor of termination.

### e. Plans for the Child by the Individuals or Agency Seeking Custody

At trial, the Department, which was the agency seeking custody, represented to the court that its plan was to transition Z.B. to Ms. Moore as a fictive kin placement and to evaluate the placement for permanency. Its alternate plan was for unrelated adoption by the foster parents. On appeal, the Department only argues in favor of adoption by the foster parents. The evidence at trial showed that the mother planned to continue working services offered by the Department, pay child support, work to pay off debt and get an apartment of her own, and allow Z.B. to be placed with her sister's mother, Ms. Moore. We have explained that both the foster parents and Ms. Moore are appropriate placements for Z.B., despite her close bond to the foster parents.

This factor is neutral in our analysis.

### f. Acts or Omissions of the Parent that May Indicate the Existing Parent-Child Relationship is Not Appropriate and Any Excuse for the Parent's Acts or Omissions

The mother's pre-removal behavior of exposing Z.B. to Royal, including returning to the home she shared with him after fleeing to a hotel, may indicate that the existing parent-child relationship is not appropriate. The mother offered no excuse. This factor weighs in favor of termination.

### 3. Considering the Record as a Whole

In analyzing the evidence in this case, we have explained that some of the evidence is subject to differing inferences. Considering the evidence in the light most favorable to the court's finding, disregarding the reasonable inferences from the undisputed evidence that do not support the court's finding, we conclude that a reasonable factfinder could have formed a firm belief or conviction that termination of the mother's rights was in Z.B.'s best interest. This conclusion rests primarily on the mother's failure to secure safe, stable housing in her own name as well as her pre-removal behavior. We conclude that the evidence is legally sufficient to support the court's finding.

When we consider the entire record, however, including the evidence that cannot be credited to the trial court's finding, we reach a different conclusion. Considering the evidence that the mother remained drug free, employed, complied with the service plan, cooperated with the Department, regularly visited Z.B., maintained a close, reciprocal bond with Z.B., continued to work on services, and agreed to pay child support, we conclude that no reasonable factfinder could have formed a firm belief or conviction that termination of the mother's rights was in Z.B.'s best interest.

The Department failed to carry its burden to demonstrate by clear and convincing, factually sufficient evidence that termination of the mother's rights to

Z.B. was in Z.B.'s best interest. Because we hold that the evidence is factually insufficient to support the trial court's best interest finding, we reverse that part of the trial court's decree that terminated the mother's rights to Z.B. We will remand for a new trial.

### III.   Conservatorship Determination

In her final issue, the mother argues that the trial court abused its discretion by appointing the Department sole managing conservator of Z.B. The Department argues that this issue is inadequately briefed and invites us to disregard the mother's third issue. We decline the invitation. *See Bertucci v. Watkins*, 709 S.W.3d 534, 542–43 (Tex. 2025) (reaffirming general disapproval of summarily dismissing issues based on procedural defects).

We review conservatorship decisions for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *Interest of D.L.W.W.*, 617 S.W.3d 64, 93–94 (Tex. App.—Houston [1st Dist.] 2020, no pet.). A finding that appointment of a parent as managing conservator would significantly impair the child's physical health or emotional development need only be supported by a preponderance of the evidence. *J.A.J.*, 243 S.W.3d at 616.

The Department argues that the mother has not preserved this issue because she failed to challenge the trial court's finding that appointment of a parent as managing conservator would not be in Z.B.'s best interest. We agree that the

mother did not challenge these findings, making them binding on this Court. *See, e.g.*, *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014) ("We defer to unchallenged findings of fact that are supported by some evidence."). And, in light of the finding that appointment of a parent as managing conservator would not be in Z.B.'s best interest, we hold that the court did not abuse its discretion by failing to appoint the mother managing conservator of Z.B. *See J.A.J.*, 243 S.W.3d at 616.

We overrule this issue.

## Conclusion

We affirm that portion of the trial court's decree that appoints the Department as Z.B.'s sole managing conservator. We reverse that portion of the trial court's decree that terminates the mother's rights to Z.B., and we remand this case to the trial court for a new trial.[11]

Susanna Dokupil
Justice

Panel consists of Chief Justice Adams, and Justices Morgan and Dokupil.

---

[11] On remand, the court may enter orders in the best interest of Z.B. *Cf. Interest of H.M.Q.*, No. 01-24-00817-CV, 2025 WL 1033755, at *14 (Tex. App.—Houston [1st Dist.] Apr. 8, 2025, pet. denied) (mem. op.) (holding that evidence was legally insufficient to support sole predicate ground for termination and noting that, on remand, court must deny termination petition or render order in best interest of child). We offer no guidance on these matters, which are not properly before us. *See Valley Baptist Med. Ctr. v. Gonzalez*, 33 S.W.3d 821, 822 (Tex. 2000) ("Under article II, section 1 of the Texas Constitution, courts have no jurisdiction to issue advisory opinions."). Moreover, "circumstances concerning the child or parent may have changed since the trial court rendered its order of termination, a matter that requires a factfinder." *Colbert v. Dep't of Family & Protective Servs.*, 227 S.W.3d 799, 816 (Tex. App.—Houston [1st Dist.] 2006, no pet.).